FILED
2012 Mar-05  PM 04:11
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

| | | |
|---|---|---|
| MISTY N. ARMSTRONG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | Case No. 3:10-cv-01469-TMP |
| | ) | |
| BAGGETT OIL COMPANY., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This matter is before the court on the motion for partial summary judgment[1] filed by defendant Baggett Oil Company ("Baggett Oil") on July 15, 2011. (Doc. 14).   The motion was supported by briefs and evidence.  (Docs. 15, 16).  Plaintiff Misty N. Armstrong filed a brief in opposition, supported by evidence.  (Docs. 18, 9).  The parties consented to the exercise of jurisdiction by the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c) on August 30, 2011. (Doc. 7).

## SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

---

[1] Although the motion for summary judgment asserts that defendant is moving on all claims and counts of the plaintiff's complaint, the memorandum brief accompanying the motion expressly states that, "Defendant will not address the claim for overtime in this motion."  (Doc. 15, p. 10). Indeed, there is no evidence or legal argument dealing with an overtime claim.  Plaintiff's complaint consists of two counts.  Count I raises hostile work environment and retaliation claims under Title VII, while Count II alleges a claim for unpaid overtime under the Fair Labor Standards Act. The court treats the instant motion as only seeking summary judgment with respect to the Title VII claims, and not addressing the FLSA overtime claim, which remains pending.

show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." Id. at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. Celotex, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is

entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The substantive law will identify which facts are material and which are irrelevant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248. 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id. at 249.  His guide is the same standard necessary to direct a verdict:  "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983).  However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff.  Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988).  Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor.  Anderson, 477 U.S. at 255.  The non-movant need not be given the benefit of every inference but only of every reasonable inference.  Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

UNDISPUTED FACTS

Considering all of the facts in the light most favorable to the plaintiff, the following facts are considered undisputed for purposes of summary judgment.

On September 9, 2008, defendant Baggett Oil hired plaintiff, Misty Armstrong, to work at one of its gasoline stations and convenience stores located in Red Bay, Alabama.  Armstrong was employed as a customer service representative and operated the store's cash register in that capacity. Armstrong worked at the defendant's Red Bay store from September 2008 until February 2010. Armstrong alleges that she was sexually harassed by the store manager, Lynette Mann, during the time she was employed by the defendant.  According to Armstrong, this harassment occurred from November 2008 until March 2009.  Armstrong filed a charge of discrimination with the EEOC and was issued a Notice of Right to Sue letter on March 31, 2010.   Thereafter, Armstrong commenced the instant lawsuit alleging claims for sexual harassment and retaliation under Title VII.  (Doc. 1, Exh. 1).  Armstrong also asserts a claim under the Fair Labor Standards Act.  The defendant has moved for partial summary judgment, seeking dismissal of the sexual harassment and retaliation claims.

Facts Relevant to Armstrong's Sexual Harassment Claim

In support of her sexual harassment claim, Armstrong generally alleges that from November 2008 until March 2009 she was subjected to unwanted homosexual advances by store manager Lynette Mann.  While Armstrong's complaint does not allege any specific instances of sexual harassment, the record furnishes some indication that her sexual harassment claim is based on the following:[2]

---

[2]This court notes that there is mention in Armstrong's deposition of an inappropriate text message from Mann to Armstrong, but the deposition testimony does not reveal what the message says or is purported to say.  No evidence of the text message has been submitted to this court.

- Mann bought Armstrong gifts, including a red, lacy thong for Valentines Day;

- Mann followed Armstrong around at work;

- Mann asked Armstrong about her feelings regarding relationships with females;

- Mann constantly called Armstrong at home;

- Mann went to Armstrong's home, including an instance where she allegedly beat on the doors and windows until Armstrong came to the door;

- Mann followed Armstrong to the area of the store where the cooler was located and attempted to hug and kiss Armstrong; and,

- Mann would stay at the store beyond her own shift in order to stay with Armstrong during the Armstrong's shift.

(Doc. 16-1, Exh. D).

In opposition to summary judgment, Armstrong submits her own affidavit.  (Doc. 18).  The affidavit does not identify any specific instances of alleged misconduct, even those that can be gleaned from a review of the defendant's evidentiary submission.  Rather, the affidavit generally asserts: "[t]hese unwanted advances involved unconsented to touching and inappropriate verbal remarks of a sexual nature, all of which made me extremely uncomfortable at work, made me nervous, made me anxious, and made me restrict my movements at work so as to try to avoid being in an area alone with store manager Lynette Mann.  Ms.  Mann attempted to hug and kiss me." (Doc. 18, Armstrong Aff. ¶ 3).

In her affidavit, Armstrong states that she first complained of the unwanted touching and inappropriate verbal sexual remarks to the store supervisor, Billy English, in January 2009.[3,4]   At

---

[3]On the corporate chain of command, English was the supervisor ranked directly above Mann.

[4]It should be noted that the plaintiff's complaint, affidavit, and deposition testimony are inconsistent regarding when Armstrong first reported the alleged harassment  The complaint alleges that the harassment was reported on February 27, 2009.  Armstrong's affidavit states that she first

that time, Armstrong told English that Mann made her feel uncomfortable and that she would try and corner Armstrong in the back of the store to hug and kiss her.  (Doc. 16, Exh. 2, Armstrong Depo. p. 137).  Armstrong alleges that English did not respond to her complaints.

Armstrong's co-worker and confidante, Violet Bishop, testified that Armstrong also came to her in January 2009 and told her that Mann was acting inappropriately.  (Doc. 16, Exh. 3, Bishop Depo. p. 21, 23).  Bishop told Armstrong to report the harassment.  Bishop testified, however, that Armstrong told her that she did not want to report the harassment in January 2009 because she was afraid it would make it worse.  At her deposition, Armstrong testified that she did not report the initial misconduct, consisting of buying Armstrong a gift and then taking money out of Armstrong's paycheck to pay for it, because she did not want to get Mann fired.

On February 26, 2009, co-worker Bishop called English on his cell-phone to report some cash shortages at the store.  (Doc. 16, Exh. 3, Bishop Depo. pp. 26-29).  During the conversation she mentioned the inappropriate behavior by Mann toward Armstrong.  (Doc. 16, Exh. 3, Bishop Depo. pp. 26-29;46-48).  Bishop testified that she did not give English a "whole lot of details," but gave him a couple of examples about "her [Mann] being all up on her [Armstrong] when she was at the cash register, and some touches and stuff" that she had witnessed.  (Doc. 16, Exh. 3, Bishop Dep. pp. 46-48).

After Bishop spoke with English in February 2009, she again told Armstrong that she needed to report the harassment to English.  Armstrong then approached English when she saw him at the

---

reported the harassment to English in January 2009.  Armstrong's deposition testimony is unclear as to when the alleged harassment was first reported.  (Doc. 16, Exh. 2, Armstrong Depo. pp. 131; 134-137).  For purposes of summary judgment, this court construes the facts in a light most favorable to the plaintiff.  Thus, this court accepts as true the allegation that she reported the harassment in January 2009, despite the lack of clarity in the record.

6

Red Bay store during one of his routine visits.  It is unclear from the record exactly when Armstrong approached English, however, there is no dispute that this happened after Bishop's conversation with English in late February 2009.  When Armstrong saw English at the store, she told him that "it was bad" and that she needed to talk to him about Mann.  English offered Armstrong some potential dates when they could meet away from the store.  On March 12, 2009, Armstrong met with English at one of the defendant's other stores, the Helton Drive location where neither Armstrong nor Mann worked.

At the March 12, 2009 meeting, Armstrong told English about Mann's advances, the requests that Mann had made to her, and the "things" that Mann had said and done.  (Doc. 16, Exh. 2, Armstrong Depo. p. 141).  Armstrong also showed English an inappropriate text message that she had received from Mann.  Armstrong testified that she gave English more details of the alleged misconduct at this meeting than she had previously told him in January 2009.  (Doc. 16, Exh. 2, Armstrong Depo. p. 141).  English told Armstrong that he would report the alleged misconduct to the "next person."

After meeting with Armstrong, English called Darlene Austin, the defendant's General Manager of Retail Sales.  Austin testified that English called her on March 12, 2009, and told her that he had met with Armstrong and that she had reported to him that she was being sexually harassed by Mann.  (Doc. 16, Exh. 1, Austin Depo. p. 17).  Austin advised English that she needed him to give her a written statement of the claim because the defendant's sexual harassment policy required as much.  Upon receiving the written statement from English, Austin called Armstrong to set up a time to meet with her about the allegations.  On March 20, 2009, Austin interviewed Armstrong regarding Mann's alleged sexual harassment.  (Doc. 16, Exh. 1, Austin Depo. p. 7; Doc.

16-1, Exh. D).  During that interview, a questionnaire that elicited specific incidents of inappropriate conduct was completed by Austin based on information provided by Armstrong.  (Doc. 16-1, Exh. D).  In response to the question of whether Mann ever physically touched her in an inappropriate way, Armstrong replied "yes" and reported that Mann tried to kiss her, hug her, and rub on her. Armstrong also answered that Mann followed her to the cooler and that Mann stayed with her after Mann's shift was over.  Armstrong further reported that she told Mann to stop the unwelcome behavior and that she had no interest in a relationship with her.  Both Austin and Armstrong signed the questionnaire and dated it March 20, 2009.

The defendant's investigation of the alleged sexual harassment also included interviewing co-worker Bishop about any harassment by Mann that she witnessed.  After interviewing Armstrong and Bishop, Austin confronted Mann with the allegations of sexual harassment.  Mann denied the allegations made against her.  As a result of the sexual harassment allegations, Mann was terminated on March 24, 2009.  (Doc. 16, Exh. 1, Austin Depo. p. 23).

Facts Relevant to Armstrong's Retaliation Claim

After Mann was terminated, the managerial position at the Red Bay store became open. Armstrong applied for the position, but was not hired as the manager.  In May 2009, Charity Wallace, a former assistant manager at the store, was hired to fill Mann's position.  Armstrong alleges Wallace told her that the reason she was not hired for the managerial position was because of the complaints she made against Mann.  In an affidavit, Wallace denies making that statement. She states she did not know of the sexual harassment complaint until she was asked by Austin if she told Armstrong she was not hired because of filing a sexual harassment complaint.  (Doc. 16-1, Exh. 5, Wallace Aff. ¶ 2).  Austin testified that Wallace was hired instead of Armstrong because she had

experience, she knew the policies, and because Austin had witnessed Wallace work in a management role. (Doc. 16, Exh. 1, Austin Depo. p. 48). Austin further testified that Armstrong's filing of the sexual harassment charge did not influence the decision to hire Wallace. (Doc. 16, Exh. 1, Austin Depo. p. 48-49).

On or around May 15, 2009, Armstrong was given an oral warning (documented in an employee counseling form) regarding some discrepancy with a credit card transaction. (Doc. 16, Exh. F). Less than one month later, on or around June 8, 2009, Armstrong was issued a written warning regarding cash shortages. (Doc. 16, Exh. G). On or about August 25, 2009, Armstrong was warned for a third time about cash shortages. (Doc. 16, Exh. H). That document forewarns of termination of employment if the identified problem persists. (Doc. 16, Exh. H).

In January 2010, Armstrong's hours were reduced from 40 hours per week to 32 hours per week, her shift was moved from day shifts to night shifts, and she was denied vacation time. (Doc. 18, Exh. 1, Armstrong Aff. ¶ 11). Austin testified that she was not involved in the decision to change Armstrong's shift or to reduce her hours. Those decisions were made by Wallace. On February 19, 2010, Armstrong had another cash shortage. (Doc. 16, Exh. I). Armstrong was terminated on or about February 25, 2010. (Doc. 16, Exh. F). Armstrong was terminated for cash shortages. (Doc. 16, Exh. M).

The Defendant's Sexual Harassment Policy

The defendant's policy and procedure manual contains a sexual harassment policy. The policy states, in part, that:

> It is Quick Stop Market's policy to prohibit harassment of one employee by another employee or by a supervisor on the basis of sex.

9

> . . . Though it is not easy to define precisely what harassment is, it certainly includes unwelcome jokes or comments, sexual advances, requests for sexual favors, unwanted touching and other verbal or physical conduct of a sexual nature.  Any employee who feels that he or she has been subjected to sexual harassment should immediately report the matter to your Supervisor or Company President <u>in writing</u>.

(Doc. 16-1, Exh. 4)(emphasis in original).

When Armstrong was hired by the defendant she signed  a policy and procedure verification form.  The policy and procedure verification form contains the following acknowledgment:

> By signing below, I acknowledge that I have read the section of *Quick Stop Market's* <u>Policy & Procedure Manual</u> listed on the same line as my signature.  I have addressed all questions that I have to my Manager and have received an adequate answer.  I acknowledge and understand my responsibilities and the companies expectations of me as outlined in the <u>Policy & Procedure Manual</u>.

(Doc. 16-1, Exh. 4).  The policy and procedure verification contains six signature lines.  Armstrong testified at her deposition that her signature only appears in one of the signature lines.  (Doc. 16-1, Exh. 2, Armstrong Depo. p. 125).  Armstrong also testified that she did not read the Policy & Procedure Manual, nor did she receive a copy of the manual at any time.   (Doc. 16, Exh. 2, Armstrong Depo. p. 123-124).

With regard to the defendant's sexual harassment policy, general manager Austin testified that every store has a copy of the employee manual.  (Doc. 16, Exh. 1, Austin Depo. p. 17).  Armstrong disputes that a copy of the employee manual was kept at the store when she first started working at the store.  (Doc. 16, Exh. 1, Austin Depo. p. 17).  Armstrong did testify, however, that she read the harassment policy sometime between March and May 2009. (Doc. 16, Exh. 2, Armstrong Depo. p. 54).

10

SEXUAL HARASSMENT

In order to sustain a Title VII claim for harassment sufficient to create a hostile work environment, the plaintiff must demonstrate that: (1) she is a member of a protected group; (2) she has been subjected to harassment based upon her gender or ethnicity; (3) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) there exists a basis for holding the employer liable.  See Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999).  The harassment, to be actionable, must be both subjectively and objectively abusive; in other words, the plaintiff must subjectively find the harassment as so severe and pervasive that it alters the conditions of employment, and that subjective assessment must be objectively reasonable.  Mendoza, 195 F.3d at 1246.   An employer is vicariously liable to a victimized employee where the hostile environment has been created by a supervisor "with immediate (or successively higher)" authority over the employee.  Faragher v. City of Boca Raton, 524 U.S. 775, 807, 118 S. Ct. 2275, 2292-93, 141 L. Ed. 2d 662, 689 (1998).

In this case, the defendant concedes that the plaintiff is a member of a protected group, that she was subjected to harassment based on her gender, and that the alleged harassment was unwelcome.  It is also undisputed that the perpetrator of the alleged sexual harassment was a supervisor with immediate authority over the plaintiff.  Thus, the only disputed issue for this court's consideration is whether the alleged harassment was sufficiently severe and pervasive to alter the terms and conditions of the plaintiff's employment such that there is a basis for holding the defendant liable.

"Severe or Pervasive" Element

The Eleventh Circuit Court of Appeals examined the "severe or pervasive" element of a Title VII sexual harassment claim in Gupta v. Florida Board of Regents, 212 F.3d 571 (11th Cir. 2000).[5] In Gupta, the court noted that the severe and pervasive requirement is critical to prevent the courts from turning ordinary socializing in the workplace into discriminatory conduct. Gupta, 212 F.3d at 583. Such ordinary socializing was deemed to include the "sporadic use of abusive language, gender-related jokes, and occasional teasing" as well as horseplay and intersexual flirtation. Gupta, 212 F.3d at 583, quoting Faragher, 524 U.S at 788. Moreover, mere flirtatious conduct, even if offensive, is not considered sexually harassing. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81, 118 S. Ct. 998, 1003, 140 L. Ed. 2d 201 (1998); Nurse "BE" v. Columbia Palms West Hosp. Ltd. Partnership, 490 F.3d 1302, 1310 (11th Cir. 2007).

Likewise, in Mendoza, the court of appeals explained:

> Although Title VII's prohibition of sex discrimination clearly includes sexual harassment, Title VII is not a federal "civility code." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 118 S. Ct. 998, 1000-02, 140 L. Ed. 2d 201 (1998) ("We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations."); *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S. Ct. 2275, 2283, 141 L. Ed. 2d 662 (1998) ("A recurring point in these opinions is that 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and

---

[5]Gupta's application of the level of severity of an action that may be actionable as retaliation has been abrogated. Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S. Ct. 2405, 2411-14, 165 L. Ed. 2d 345 (2006). See also Moore v. ITT Tech. Inst., 226 Fed. Appx. 869, 871 (11th Cir. 2007); Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008). The explanation of the "severe and pervasive" requirement for a hostile environment claim, however, remains controlling law in this circuit.

> conditions of employment.'" (internal citation omitted)); *Meritor [Savings Bank, FSB v. Vinson]*, 477 U.S. at 67, 106 S. Ct. 2399 ("Not all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII.").

Id. at 1245.  In Mendoza, the supervisor told plaintiff he was "getting fired up," rubbed his hip against hers, constantly followed her and stared at her, and made sniffing sounds while looking at her groin area.  The court found such conduct to fall "well short" of the level necessary to sustain a hostile environment claim.  195 F.3d at 1247.

As mentioned directly above, in order to recover under Title VII for sexual harassment the "employee must 'subjectively perceive' the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable."  Id.  In this case, Armstrong filed an affidavit in opposition to summary judgment that gives the closest indication of her subjective perception of the alleged harassment.  (Doc. 18, Exh. 1).  Armstrong asserts in that affidavit that she was "subjected to unwanted homosexual advances by the female store manager Lynette Mann."  (Doc. 18, Exh. 1, Armstrong Aff. ¶ 2.).  Further, the affidavit states: "These unwanted advances involved unconsented to touching and inappropriate verbal remarks of a sexual nature, all of which made me extremely uncomfortable at work, made me nervous, made me anxious, and made me restrict my movements at work so as to try and avoid being in an area alone with the store manager Lynette Mann."  (Doc. 18, Exh. 1, Armstrong Aff. ¶ 3).  While Armstrong's affidavit attests to the fact that she was undoubtedly nervous and anxious, it falls short of establishing that the Armstrong subjectively perceived the harassment as severe and pervasive.  The affidavit does not, for example, link Armstrong's nervousness and anxiety to any subjective belief that the terms and conditions of her employment were altered.  Indeed, there is no

13

evidence that Armstrong was unable to perform her job duties as a result of her working environment.  Because Armstrong has failed to elucidate how she perceived the harassment as altering the conditions of her employment, there is no evidence before this court to establish the subjective component of the severe and pervasive criteria for Title VII recovery.

Even if Armstrong's statements of being uncomfortable, nervous, and anxious could be construed as sufficiently evidencing the subjective component of severe or pervasive discrimination, she must still establish that her subjective perception was objectively reasonable.   In determining whether a plaintiff meets the objective component of the severe and pervasive requirement, courts consider: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating; and (4) whether the conduct unreasonably interferes with the employee's job performance.  Allen v. Tyson Foods, 121 F.3d 642, 647 (11th Cir. 1997); citing Harris v. Forklift Systems, Inc., 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993).  There is no evidence before this court establishing the frequency of the harassing conduct that is at issue in this litigation.  While Armstrong alleges that the harassment occurred from November 2008 until March 2009, there is no indication within that time frame that would establish how often the alleged harassment actually occurred.  Even if Armstrong alleged that the harassment was constant during this time period, however, it is still unlikely that she would establish an actionable claim given the fact that the harassment occurred, at most, over a four month period.  See e.g. Mendoza, 195 F.3d at 1243-1249 (supervisor's constant following of employee over 11 month period was insufficient, standing alone, to establish severe and pervasive conduct).

With regard to the severity of the conduct alleged, this court finds that the plaintiff's allegations, even when construed in a favorable light, fall short of actionable.  The complaint made

the basis this lawsuit alleges only that the plaintiff "was sexually harassed in the workplace by her female store manager" from November 2008 until March 2009. (Doc. 1, Exh. 1).  To that allegation Armstong's affidavit adds scant detail, attesting that she was subjected to unwanted sexual advances in the form of inappropriate verbal remarks of a sexual nature and unconsented touching.  While a review of the record does provide more insight to the specifics of Armstrong's claims, it does not reveal actionable conduct.  The evidence is simply too scant to show objectively "severe" conduct.

The allegations of misconduct that can be gleaned from the record consist of Mann following Armstrong around at the convenience store, calling her at home, giving her inappropriate gifts, attempting to hug and kiss her, asking her about her feelings regarding female relationships, "hanging around" Armstrong's shift after Mann was "off shift," and visiting Armstrong at her home. The record also describes an incident where the supervisor went to Armstrong's home and beat on the doors and windows until she came to the door.   While these instances of alleged sexual harassment are disturbing, and undoubtedly made Armstrong uncomfortable, even nervous and anxious, there is no evidence that the conduct altered her work environment such that "it unreasonably interfered with the employee's job performance" as required by the law.  This is especially true given the fact that numerous decisions have held more egregious behavior insufficiently severe and pervasive.[6]

The Eleventh Circuit Court of Appeals recently held that a superintendent's comments to a subordinate employee that he wanted to  "ram his tongue down her throat" and if  "I could just get your tongue, I would suck it out of your mouth," as well as visiting plaintiff's home uninvited,

---

[6]Mendoza includes a survey of cases from other appellate circuit courts where conduct that was more frequent, more overt, more physical, and more intimidating than the conduct alleged in this case, was deemed insufficiently severe or pervasive.  195 F.3d at 1247.

calling plaintiff on the phone on numerous occasions, and asking plaintiff to meet him at a hotel, were insufficiently severe or pervasive" to establish a Title VII claim.   Leeth v. Tyson Foods, Inc., ___ F.3d ___, No. 10-14849, 2011 WL 6371795, at *1 (11th Cir., Dec. 20, 2011).   Moreover, the Eleventh Circuit's Mendoza holding that a supervisor's acts of rubbing his hip against the plaintiff's hip while touching her shoulder and smiling, looking at her groin area while making a sniffing sound, and "constantly" staring and following her, over an eleven-month period, "fell well short of the level of either severe or pervasive conduct to alter [the] terms or conditions of employment," simply requires more than the plaintiff has alleged in this case.   Mendoza, 195 F.3d at 1247-49.   In comparison to these cases and other well-established precedent, the allegations of sexual harassment at issue in this case fail to meet the severe and pervasive threshold necessary for sustaining a Title VII sexual harassment claim.

Further, there is no evidence before this court establishing that Armstrong felt physically threatened or even humiliated by the alleged harassment.   Rather, in her affidavit, Armstrong attests only that the unwelcome advances made her extremely uncomfortable, nervous, and anxious.   (Doc. 18, Exh. 1).   Nor is there any evidence establishing how any of the instances of alleged sexual harassment affected Armstrong's ability to perform her job.   Given the lack of evidence to establish that the alleged conduct was frequent, severe, physically threatening or humiliating, and considering that there is no evidence of any conduct unreasonably interfering with Armstrong's job performance, her claims are legally untenable.

Faragher/Ellerth Defense

Even if the sexual harassment claims were sufficiently severe and pervasive to state a viable claim, the defendant argues that it is nonetheless entitled to summary judgment on the authority of Faragher v. City of Boca Raton, 524 U.S. 775, 118 S. Ct. 2275, 141 L. Ed.2d 662 (1998). Specifically, the defendant contends that it is not vicariously liable for any sexual harassment alleged "because it had an anti-harassment policy in place, responded to plaintiff's allegations by conducting an investigation culminating in the manager's termination, and because the plaintiff unreasonably failed to take advantage fo the defendant's anti-harassment policy until March 2009." (Doc. 15).

The affirmative defense enunciated in the Faragher decision and the case of Burlington Industries Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998), is unavailable in litigation where the plaintiff has suffered a tangible adverse employment action, such as being fired or demoted. The Supreme Court has defined a tangible employment action as one involving, in most cases, "direct economic harm." Ellerth, 524 U.S. at 762. In this case, there is no evidence that Armstrong suffered any adverse employment action. There is no evidence, for example, that Armstrong suffered a decrease in pay because she was not receptive to Mann's sexual advances. The only allegation of any adverse employment action that could be construed as involving a direct economic harm is made in connection with Armstrong's retaliation claim; namely, that her hours were reduced from 40 hours a week to 32 hours a week. Armstrong's hours were not cut, however, until January 2010, at least eight months after the alleged harassment ended, and *after* the offending supervisor was terminated in March 2009. Moreover, the defendant submitted evidence that Armstrong never received any disciplinary action or had her hours cut during the time Mann was supervisor. Thus, accepting Armstrong's alleged facts as true, there is no evidence that the

17

offending supervisor's harassment "culminate[d] in a tangible employment action, such as discharge, demotion, or undesirable reassignment." <u>Faragher</u>, 524 U.S. at 808, quoting <u>Burlington</u>, 524 U.S. at 762-63. Because there are simply no facts that tie the offending supervisor to any adverse employment action, the <u>Faragher-Ellerth</u> defense is available if the defendant meets its burden under that defense.

The <u>Faragher-Ellerth</u> defense has two components, one requiring that the employer act to prevent or correct workplace harassment, and the other requiring that the employee protect herself by participating in the employer's procedures – usually by promptly reporting any harassment or discrimination. To prevail under this defense, an employer must show "not only that it fulfilled its responsibility, but also that the employee failed to fulfill hers." <u>Baldwin v. Blue Cross/Blue Shield of Alabama</u>, 480 F.3d 1287, 1292 (11th Cir. 2007).   As the Eleventh Circuit Court of Appeals stated:

> An employer avoids liability under this defense if: (1) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior"; and (2) the employee "unreasonably failed to take advantage of any preventive or corrective opportunities [it] provided." <u>Faragher</u>, 524 U.S. at 807, 118 S. Ct. at 2293; <u>Ellerth</u>, 524 U.S. at 765, 118 S. Ct. at 2270. Because it is an affirmative defense, the employer bears the burden of establishing both of these elements. <u>See</u> <u>Frederick v. Sprint/United Mgmt. Co</u>., 246 F.3d 1305, 1313 (11th Cir. 2001).

<u>Baldwin</u>, 480 F.3d at 1303.

In this case, the defendant had a sexual-harassment policy that was included in an employee policy and procedure manual.   The defendant submitted evidence that every store had an employee manual containing the sexual harassment policy.  (Doc. 16, Exh. 1, Armstrong Depo. p. 17-18).  The defendant also submitted evidence of its practice to have all new hires review the policy and procedure manual and acknowledge in writing that they reviewed certain portions of the manual.

(Doc. 16-1, Exh. 4, Austin Aff. ¶ 5).  This evidence satisfies the defendant's initial burden under Faragher-Ellerth.  See Madray v. Publix Supermarkets, Inc., 208 F.3d 1290, 1298-99 (11ᵗʰ Cir. 2000) (". . . the Supreme Court [in Faragher] implied that employers could meet the initial burden in determining whether they had exercised reasonable care to prevent sexual harassment by promulgating an anti-harassment policy.").

This court also finds that the defendant exercised reasonable care to promptly correct the sexual harassing behavior.  The evidence is undisputed that the first time a complaint of harassment was made in writing, as required by the defendant's policy, was in March 2009.  The defendant submitted evidence that once the written complaint of harassment was received an investigation was initiated.  That investigation included interviewing Armstrong and her co-worker Bishop regarding the allegations of harassment.  (Doc. 16, Exh. 1, Austin Depo. p. 18-21).  During Armstrong's interview, Austin gathered additional facts concerning the allegations of harassment and memorialized those facts in a questionnaire form that both she and Armstrong signed.  That form is dated March 20, 2009.  After the interviews were conducted, the defendant presented the allegations to the offending supervisor.  The supervisor denied the allegations and was ultimately terminated.  The termination occurred on March 24, 2009.  Thus, within two weeks of receiving written notice of Armstrong's allegations, the defendant terminated Mann for sexual harassment. This court finds that even construing the facts in Armstrong's favor, there is undisputed evidence that the defendant acted reasonably and promptly in responding to the written complaint of harassment.[7]

---

[7]This court must construe the facts in Armstrong's favor, meaning that the court accepts as true that Armstrong first verbally reported the harassment to English in January 2009, despite the inconsistencies that appear in the record.  Even if this court accepts that the harassment was first

As to the second component of the <u>Faragher-Ellerth</u> defense, this court finds that Armstrong failed to take advantage of any preventative or corrective opportunities provided by the defendant. "To preclude a finding that an employee failed to take advantage of preventive or corrective measures 'an employee must comply with the reporting rules and procedures her employer has established.'" <u>Speigner v. Shoal Creek Drummond Mine</u>, 402 Fed. Appx. 428, 431 (11th Cir. 2010) (unpublished), quoting <u>Baldwin v. Blue Cross/Blue Shield of Ala.</u>, 480 F.3d 1287, 1306 (11th Cir. 2007). In this case, the defendant's sexual-harassment policy required that "[a]ny employee who feels that he or she has been subjected to sexual harassment should immediately report the matter to your Supervisor or Company President <u>in writing</u>." (Doc. 16-1, Exh. 4) (emphasis in original). Accepting Armstrong's allegations as true, she first reported the harassment in January 2009. At that time, however, she did not submit any written complaint, rather she verbally communicated the harassment to Billy English. Armstrong's failure to comply with the requirements of the defendant's anti-harassment policy, precludes a finding that she took advantage of the defendant's preventive or corrective measure in January 2009.

While Armstrong denies reading the sexual-harassment policy until sometime between March and May of 2009, the testimony establishes that she knew, from her co-worker's instruction, how to report the harassment. Moreover, Armstrong's signature appears on a policy and procedure verification form that contains an acknowledgment of understanding regarding the defendant's

---

reported in January 2009, and it does, the outcome in this case is the same. This is so because there was no written complaint of harassment made in January 2009. The defendant's sexual-harassment policy expressly states that any complaints of harassment must be made in writing. Consequently, the question of whether the defendant acted reasonably and promptly in response to the reported harassment must be answered in context of the undisputed fact that the defendant first received written notice of the harassment in March 2009.

policies and procedures.  (Doc. 16-1, Exh. 4).  This court notes the discrepancy concerning whether Armstrong signed all of the signature lines on the verification form, but finds the fact that she did sign at least one signature line triggered an acknowledgment of understanding that, at the least, put her on notice that certain policies and procedures existed.  If she failed to read the policies that were in the employee manual, she did so at her own peril.  Just as employers have a duty to communicate their policies to employees, employees have a duty not to be willfully blind to their employers' policies.  Further, Armstrong testified that she understood how to report harassment at other places of employment.

Based on the evidence before this court, it appears less likely that Armstrong did not know how to report the harassment and more likely that she did not want to report the harassment until March 2009.  (Doc. 16, Exh. 2, Armstrong Depo. p. 70).  Indeed, Armstrong testified that she did not report the initial misconduct because she did not want to get Mann fired.  (Doc. 16, Exh. 2, Armstrong Depo. p. 70).  Co-worker Bishop also testified that while she told Armstrong to report the harassment in January 2009, she chose not to do so because she thought it would make things worse.  (Doc. 16, Exh. 3, Bishop Depo. p. 21; 23).  Because "[s]ubjective fears of reprisal . . . standing alone, do not excuse an employee's failure to report a supervisor's harassment," this court cannot conclude that Armstrong took advantage of the corrective opportunities provided by the defendant.  This is especially true given the fact that Armstrong did not follow the defendant's requirements for reporting harassment until March 2009.  Once the harassment was reported in writing, the defendant acted reasonably and promptly.  Accordingly, this court finds that the defendant prevails under the <u>Faragher-Ellerth</u> defense, even if the harassment alleged was proven severe and pervasive.

RETALIATION CLAIM

Armstrong also asserts a retaliation claim in her complaint, contending that in retaliation for reporting the sexual harassment she was "not hired as the new store manager" and wrongfully terminated. (Doc. 1, Exh. 1). Title VII's anti-retaliation provision makes it unlawful for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). To make a *prima facie* showing of retaliation, the plaintiff must show: (1) that she engaged in statutorily protected conduct; (2) that she suffered adverse employment action; and (3) that there is "some causal relation" between the two events. Leeth, 2011 WL 6371795, at *4 (citing Alvarez v. Royal Atlantic Developers, Inc., 610 F.3d 1253, 1268 (11th Cir. 2010) (citing McCann v. Tillman, 526 F.3d 1370, 1375 (11th Cir. 2008)). When evidence supporting a Title VII retaliation claim is circumstantial—as is the case here—courts apply the McDonnell Douglas burden-shifting framework. Id. (citing Brown v. Alabama Dep't of Transp., 597 F.3d 1160, 1181 (11th Cir. 2010, and McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). "Once the plaintiff establishes the *prima facie* case, the burden shifts to the employer to 'proffer a legitimate, non-retaliatory reason for the adverse employment action.'" Id., (citing Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998)). If the defendant establishes a legitimate, non-discriminatory reason, then burden shifts to the "plaintiff to show by a preponderance of the evidence that the proffered reason for the adverse action is 'a pretext for prohibited, retaliatory conduct.'" Id., (citing Olmstead, 141 F.3d at 1460).

22

In this case, there is no *prima facie* case of retaliation.  Armstrong claims that she was retaliated against by not being hired for a managerial position.  (Doc. 18, Exh. 1, Armstrong Aff. ¶ 13).  She also claims that the defendant retaliated against her by cutting her hours, changing her shift, denying her vacation time, and by terminating her.  (Doc. 18, Exh. 1, Armstrong Aff. ¶ 13).  To the detriment of these claims, Armstrong cannot establish a causal connection between making a sexual harassment claim and the alleged adverse employment actions.  With regard to the managerial position, the evidence before the court establishes that the defendant hired a former employee with managerial experience (that Armstrong did not possess) as the new store manager.  This hire occurred sometime in May of 2009, approximately four months after Armstrong alleges that she first reported the harassment.   As to Armstrong's hours being cut, the shift change from days to nights, and the denial of vacation time, this occurred in January 2010, at least ten months after the written complaint of harassment in March 2009.  (Doc. 18, Exh. 1, Armstrong Aff.¶ 11).  Put simply, Armstrong's claims lack a close temporal connection between the two events to evidence causation. The Supreme Court's decision in Clark County Sch. Dist. v. Breeden makes clear this point:

> The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be "very close," O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1253 (C.A.10 2001). See, e.g., Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir. 1997) (3-month period insufficient); Hughes v. Derwinski, 967 F.2d 1168, 1174-1175 (7th Cir. 1992) (4-month period insufficient).

Clark County School Dist. v. Breeden 532 U.S. 268, 273-274, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001).  On the authority of this precedent, this court finds that there is insufficient evidence to establish a *prima facie* case of retaliation.

Assuming that Armstrong could establish a *prima facie* case of retaliation, however, her claim still fails.  The defendant presented evidence that Armstrong was not hired for the managerial position because there was a more qualified candidate, a candidate who had previously worked at the store in a managerial position.  Even when accepted as true, Armstrong's allegations are insufficient to prove by a preponderance of the evidence that the defendant's reason for hiring the store's former assistant manager, instead of herself who had no managerial experience, was pretextual.  Armstrong cites to the deposition of Don Berryhill, one of the defendant's managers, to conclude that she was retaliated against by not being hired to replace Mann.  Berryhill testified, however, that he was not directly involved with the decision to hire Wallace for the managerial position instead of Armstrong.  Moreover, Berryhill testified that the decision to hire Wallace was Austin's decision to make.  (Doc. 18, Exh. 3, Berryhill Depo. at 41).  Austin, the only person identified in the record as responsible for making the decision to hire Wallace, testified that Armstrong's filing of a sexual harassment charge had nothing to do with why she was not hired.  Austin also testified that she hired Wallace because she had the experience, she knew the policies, and Austin had previously witnessed her in a management role.  (Doc. 16, Exh. 1, Armstrong Depo. pp. 47-48).

The record also establishes that Armstrong's hours were reduced because of a pattern of her missing one shift per week.  With regard to the change in her shifts, the record evinces that this change was made due to a personality conflict between Armstrong and Wallace.  (Doc. 16,

Exh. 5, Wallace Aff. ¶ 3).  Again, the reduction in hours and the change to Armstrong's schedule were made a year after Armstrong alleges she first reported the harassment and at least ten months after Mann was terminated.  There is simply no evidence before this court that these actions were pretext for a discriminatory motive, much less sufficient evidence to carry the burden of proving pretext by a preponderance of the evidence.  Armstrong also alleges that she was wrongfully terminated in retaliation for making a complaint of sexual harassment.  The evidence establishes, however, that Armstrong was terminated for cash shortages.  Further, the defendant submitted evidence that Armstrong was not terminated until she incurred her fourth cash shortage, which occurred after she was given three warnings about the problem of cash shortages.[8]  (Doc. 16, Exhs. F, G, H, I.).  Because the defendant articulates legitimate, nondiscriminatory reasons to explain each of the alleged retaliatory acts, and in the absence of any evidence proving pretext by a preponderance of the evidence, the plaintiff's retaliation claim fails.

---

[8]In her affidavit, Armstrong states "I was ultimately terminated for allegedly having cash shortages, when other similarly situated co-workers such as Nina Wood, Grace Nelson and Bernice Sweeney had similar shortages, but were not terminated."  (Doc. 18, Armstrong Aff. ¶ 11). There is no evidence before this court, beyond plaintiff's own deduction, to substantiate the allegation that other similarly situated co-workers were treated differently.  Plaintiff has failed to show that the disciplinary infractions of these co-employees were "nearly identical" to hers.  McCann v. Tillman 526 F.3d 1370, 1374 n. 4 (11th Cir. 2008).  Plaintiff had been warned about cash shortages *three* times before she was terminated.  There is no evidence that her co-employees had that number of infractions.  Plainly, one or two or even three cash shortages did not result in termination, as it took four for plaintiff to be terminated.  Absent some evidence that these co-employees had an equal or greater number of cash shortages, the court cannot infer any discrimination in the treatment of plaintiff.

CONCLUSION

Consistent with the foregoing discussion of the evidence presented and law governing this action, this court determines that defendant's motion for partial summary judgment is due to be GRANTED as to Count I of the complaint, alleging a hostile work environment claim and a retaliation claim under Title VII.[9]  An order granting the motion will be entered contemporaneously herewith.

DONE and this the 5th day of March, 2012.

T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE

---

[9]The FLSA overtime claim in Count II remains pending.

26